PANTONE, INC., Plaintiff,

v.

A. I. FRIEDMAN, INC., Defendant.

No. 68 Civ. 3933.

United States District Court
S. D. New York.

Dec. 17, 1968.

Friedman & Goodman, Brooklyn, N. Y., for plaintiff.

Delson & Gordon, New York City, for defendant.

MANSFIELD, District Judge.

Plaintiff, the originator of a color matching system embodied in a copyrighted booklet called "Pantone Matching System," which is used by artists and printers, seeks a preliminary injunction restraining the defendant, a distributor of artists' supplies, from publishing or selling a leaflet containing a color matching system published by Para-Tone, Inc. of Illinois, together with related materials on the grounds (1) that the Para-Tone leaflet and materials infringe plaintiff's copyrighted work, and (2) that defendant's activities in the distribution of the Para-Tone leaflet and related materials constitutes unfair competition in violation of § 43(a) of the United States Trademark Act, 15 U.S.C. § 1125(a). Defendant denies infringement or unfair competition and asserts various affirmative defenses. On December 6, 1968 the Court held a hearing and took testimony of witnesses for the purpose of resolving certain factual issues. After careful review and appraisal of the evidence, and credibility of the witnesses, the motion is granted for the reasons set forth below.

Although the parties disagree as to copyrightability and infringement, the essential facts are not in dispute. It appears that the increasing use of costly colors in our ever-expanding volume of advertising media (magazines, newspapers, TV, etc.) and in commercial art has led to a demand by artists, manufacturers, designers and printers for the development of methods that will enable all segments to coordinate communications between each other with respect to color, with a view to avoiding errors and insuring understanding and faithful reproduction of shades for a specific use and medium. With this objective in mind plaintiff has invested large sums in the construction and outfitting of a color testing laboratory where it operates modern, expensive, analytical equipment to

grind, test, produce, publish and reproduce colors in various forms. It has entered into written license agreements with various printing ink manufacturers, licensing its trademark color matching system and its know-how and formulas to them on certain conditions. As part of this system plaintiff created and published in 1963 a booklet called the "Pantone Matching System," of which it has sold some 200,000 copies for a total of approximately $700,000. The booklet represented the tangible result of plaintiff's efforts in the color matching field and constitutes the mainstay of its business. It consists of 72 pages, each bearing a series of bands of carefully selected colors which are arranged in a fashion or plan designed, through variation of certain basic colors, to provide an extensive range of selection derived from use of eight basic colors plus black and transparent white. Plaintiff's selection of the eight basic colors and of blends of these colors to provide a range of acceptable color values, presented in attractive gradations moving from one basic hue and its variations into another, was the product of a great deal of effort which required careful consideration of numerous artistic factors including the aesthetic attributes of each shade and its use in the commercial art field.

At the time when plaintiff's booklet was introduced to the trade there was nothing novel or original about the concept or use of color cards, color matching booklets, or other publications designed for selection or matching of colors. Many such booklets had long been on the market. Defendants, for instance, introduced into evidence some pre-existing color booklets that were substantially the same in size and shape as that created by plaintiff. (Both contain pages in the form of narrow cards held together with a swivel screw, each card imprinted with bands of colors.) Furthermore, some of the existing booklets offered color selections in a form that showed gradations of color ranging from yellow to deep blue. Plaintiff, however, contends that its arrangement and mode of expression of its color matching system is unique and original, and had never before to plaintiff's knowledge been presented in the form found in plaintiff's copyrighted booklet. Plaintiff's booklet, unlike any of the others shown to the Court, presents the color system in the following fashion: On each page of the booklet there appears a band of a single basic color or mixture of two basic colors (e. g., yellow, or yellow mixed with warm red). Variations in shade from this basic color or mixture, developed through formulas of the color or mixture which add black and white, are then shown as shades or tints on each side of the basic color or mixture of colors, together with the formulas for duplicating them, and Pantone's serial number. The resulting booklet offers a series of over 500 gradual shade variations, each keyed to a basic color or mixture of basic colors. Since color reproduction depends greatly on the type of paper surface to which a given color is applied, the booklet is divided into two sections, one showing the colors on coated paper, and the other on uncoated paper.

■ In order to be copyrightable plaintiff's work need not be strikingly unique or novel as long as its contribution is more than a trivial variation. Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 (2d Cir. 1951) (per Frank, C. J.); Ketcham v. New York World's Fair 1939, 34 F.Supp. 657 (E.D.N.Y. 1940), affd., 119 F.2d 422 (2d Cir. 1941) (color plan for 1939 World's Fair).

" 'Original' in reference to a copyrighted work means that the particular work 'owes its origin' to the 'author.' No large measure of novelty is necessary. Said the Supreme Court in Baker v. Selden, 101 U.S. 99, 102–103, 25 L.Ed. 841: 'The copyright of the book, if not pirated from other works, would be valid without regard to the novelty, or want of novelty, of its subject-matter. The novelty of the art or thing described or explained has nothing to do with the validity of the copyright. To give to the author of the book an exclusive property in the art described therein, when no examination of its

novelty has ever been officially made, would be a surprise and a fraud upon the public.'

\* \* \* \* \* \*

"It is clear, then, that nothing in the Constitution commends that copyrighted matter be strikingly unique or novel. Accordingly, we were not ignoring the Constitution when we stated that a 'copy of something in the public domain' will support a copyright if it is a 'distinguishable variation' ; or when we rejected the contention that 'like a patent, a copyrighted work must be not only original, but new', adding, 'That is not \* \* \* the law as is obvious in the case of maps or compendia, where later works will necessarily be anticipated.' All that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.' Originality in this context 'means little more than a prohibition of actual copying.' No matter how poor artistically the 'author's' addition, it is enough if it be his own. Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 250, 23 S.Ct. 298, 47 L.Ed. 460." (Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 at 102–03)

■ The foregoing principles have been repeatedly affirmed in decisions holding that the test for determining copyrightability is originality (i. e., independent creation or individuality of expression) rather than novelty, and that originality of even the slightest degree, even if it amounts to no more than a re-arrangement of age-old ideas, is sufficient. Peter Pan Fabrics, Inc. v. Dixon Textile Corp., 280 F.2d 800, 802 (2d Cir. 1960), on remand, 188 F.Supp. 235 (S. D.N.Y.1960) ; Gelles-Widmer v. Milton Bradley Co., 313 F.2d 143, 147 (7th Cir. 1963), cert. denied, 373 U.S. 913, 83 S. Ct. 1303, 10 L.Ed.2d 414 (1963) (educational type flash cards) ; Scott v. WKJG, Inc., 376 F.2d 467 (7th Cir. 1967), cert. denied, 389 U.S. 832, 88 S.Ct. 101, 19 L. Ed.2d 91 (1968) ; Peter Pan Fabrics, Inc. v. Acadia Co., 173 F.Supp. 292 (S.D. N.Y.1959), affd., 274 F.2d 487 (2d Cir. 1959) ; Amplex Mfg. Co. v. A. B. C. Plastic Fabricators, Inc., 184 F.Supp. 285 (E.D.Pa.1960).

■ After careful examination of plaintiff's mode of expression, combination and arrangement of colors in its booklet in the light of the foregoing principles, and comparison with pre-existing color charts and exhibits shown to the Court, plaintiff's booklet appears to possess sufficient originality and uniqueness in its embodiment of its mode of expression to qualify it for copyrightability. Although the mere portrayal of a series of gradations of color shades, standing alone, would present a doubtful case for copyright protection, the arrangement here possessed the already described unique quality which apparently gained ready recognition on the part of artists in a critical profession. In an article written by defendant's sales manager entitled "New Developments in the Graphic Arts", which appeared in the June 1968 issue of "Print", a trade magazine, the author acknowledged the uniqueness of plaintiff's system, stating:

"This system provides a common language between the artist and the printer. \* \* \* Although manufacturers have sold swatch books in the past (e. g., IPI), this system is unique. \* \* This system bridges the gap from the artist to the printer. \* \* \* "

■ The originality of plaintiff's work lay in the new arrangement employed to facilitate selection and matching of colors, which was accomplished by placing each basic color or mixture in the center of each strip or page of related colors and then placing on each side of it the lighter tints achieved from addition of transparent white and on the other side of it the darker shades achieved by the addition of black. This embodiment or mode of expression had not previously been published and was the plaintiff's original creation. Some weight must also be given to the existence of valid certificates of registration issued by the Copyright Office, which give rise to at least *prima facie* evidence, or a presumption, of copyright validity. H. M. Kolbe

Co. v. Armgus Textile Co., 184 F.Supp. 423 (S.D.N.Y.1960), affd., 279 F.2d 555 (2d Cir.1960); Home Art, Inc. v. Glensder Textile Corp., 81 F.Supp. 551, 552 (S.D.N.Y.1948); Edward B. Marks Music Corp. v. Wonnell, 61 F.Supp. 722, 725 (S.D.N.Y.1945).

Plaintiff was originally organized under the laws of New York under the name "Pantone Press, Inc." In September 1959 it filed a certificate of change of name, changing its name to Pantone, Inc., and on October 2, 1962 it incorporated a wholly-owned subsidiary under the name of Pantone Press, Inc. On November 13, 1963, plaintiff's wholly-owned subsidiary, Pantone Press, Inc., applied for and obtained from the Register of Copyrights a registration of a claim to a copyright in the Pantone Matching System, receiving Registration No. A660106. The date of publication was given in the application as September 25, 1963. On May 28, 1965 plaintiff's wholly-owned subsidiary, Pantone Press, Inc., was merged into it.

On September 23, 1968, plaintiff filed an application in the name of "Pantone Press, Inc. (also known as Pantone, Inc.)" for registration of a copyright in the same work, described as "Pantone Matching System Printers Edition," stating the date of publication to have been September 30, 1963.* A Certificate of Registration, No. A17846, was thereupon issued by the Copyright Office to plaintiff. The duplication in copyright registrations of the same work arises out of an oversight: by 1968 the representative of the plaintiff who had executed the 1963 copyright application, and the attorney who handled it, had ceased to be associated with the plaintiff, with the result that in 1968 plaintiff's president, overlooking the fact that a copyright had been registered in 1963, filed and obtained registration of a new copyright claim to the same work. Both copyright applications gave the author's address as

461 8th Avenue, New York 1, N. Y. and used the name "Pantone."

On February 1, 1965, Pantone Press, Inc., plaintiff's wholly-owned subsidiary, assigned the copyright registration under Certificate No. A660106 to L. F. Dommerich & Co., Inc., a finance company which has factored plaintiff's accounts receivable since 1965 and has since become a division of the Chemical Bank New York Trust Co. The assignment was executed solely as collateral to secure plaintiff's borrowings, the ownership in the copyright to pass to the assignee only in the event of a default, which has not occurred. Furthermore, the vice president of the Chemical Bank New York Trust Co. in charge of the Dommerich Division has submitted his affidavit and testified that the arrangement was for security purposes only and that the bank consented to plaintiff's institution of this suit for the purpose of enforcing its copyright and would, if required, join as a party plaintiff.

■ The color matching system distributed by the defendant consists of a four-page leaflet entitled "Transparent Color Sheets" which was produced by Para-Tone and introduced onto the market in 1968. It schedules a series of 23 rows of individual colors, with the rows arranged horizontally. Each row (except for two rows at the end), like each page of plaintiff's booklet, bears in the middle a sample of a basic color in a square area under a column headed "HUE" with two different variations labelled "Tints" in square areas on one side and three different variations labelled "Shades" in separate squares on the other side. Each of the "Tints" and "Shades", like the tints and shades shown on each page of plaintiff's work together with the basic hue, is achieved by addition of quantities of white or black, respectively, to the basic color, according to a formula supplied by Para-Tone. Likewise each of

---

* The addition of the words "Printers Edition" and rearrangement of the order of some of the introductory text (which otherwise was identical) constituted immaterial variations not affecting the issues here. Except for such minor, inconsequential differences, the works were identical.

the "Hues", "Tints" and "Shades", like the basic colors, shades and tints found on each page of plaintiff's publication, bears a serial number (for ordering purposes) and all colors (as in plaintiff's system) are based on the use of eight primary colors, plus black and white. Like plaintiff's system, Para-Tone's system mixes the primary colors and adds black or white to arrive at 140 shades of color. Although the variety of colors offered in the Para-Tone booklet is less than that shown in plaintiff's booklet (which offers 500 colors), the system of arrangement and portrayal in both is essentially the same and is offered to artists, designers and printing manufacturers for the identical purpose. With respect to each color system, the artist is told that he can order artists' papers or sheets that will exactly match each of the varied shades shown on the sample booklet with assurance that identically reproduced colors will be furnished by printing ink manufacturers, to whom the originator of the system (Pantone in one case and Para-Tone in the other) have furnished mixing directions which set forth the correct formulas for use of the eight basic primary colors plus specific amounts of black and white to reproduce each shade. This substantial identity in the two systems and in their embodiment is illustrated by the following statement of defendant's sales manager describing the Para-Tone system:

"The most comprehensive and multifaceted system is being produced by Para-Tone Company. Its system consists of opaque papers and transparent color sheets that can be matched easily with standard printer's inks. There are 140 colored acetate sheets available in matte and gloss in two sizes: 10″ by 14″ and 20″ by 28″. The opaque papers are identical to the acetate sheets. For the printer there are mixing charts which furnish the correct formulas to the 140 colors. The formulas are based on ten standard colors: black, white and the eight primary colors. These inks can be combined to equal the color of the specified sheet. One pound of a medium red results

from the combination of ten ounces of process red, two ounces of white and four ounces of black. This red will match closely the reflective value and transparency of a red Zipatone acetate sheet."

There are some differences between plaintiff's booklet and that originated by Para-Tone and distributed by the defendant. For instance, plaintiff uses separate sheets of its booklet for each series of seven related colors, whereas Para-Tone shows them in separate horizontal rows on four pages. The plaintiff offers 505 colors, whereas Para-Tone offers only 140. Plaintiff provides the mixing formula under each color shade, whereas Para-Tone supplies the formula separately to the printer. An overall comparison of the two publications, however, demonstrates that the Para-Tone four-page booklet distributed by the defendant constitutes a substantial copying of the essential features of plaintiff's arrangement.

Any doubt about Para-Tone's copying of plaintiff's work is dispelled by Para-Tone's publication, for use in connection with its publication, of a typewritten cross-reference sheet entitled "Para Tone New Colors" (a copy of which is attached hereto). It lists each of the hues, shades and tints offered by Para-Tone and plaintiff opposite a very similar color, shade or tint offered by Pantone, together with the respective Para-Tone and Pantone serial numbers for each, in such a way as to create the impression that each such correlated color is the same. The inference is inescapable that the publisher's intent was to demonstrate that the two color matching systems were interchangeable and lead customers to believe that there was a Para-Tone color that could be substituted for at least 140 of the colors offered by the plaintiff. This cross-reference sheet has been distributed by the defendant to close to a thousand of its customers.

The proof leaves no doubt about Para-Tone's access to plaintiff's work before publication of "Transparent Color Sheets." Although Para-Tone had, prior to 1968, published color sheets, they were

substantially different from the booklet which is the subject of the present suit and did not seek to equate its colors with those of plaintiff through use of a cross-reference sheet. Furthermore, the Court is convinced, after a careful comparison of the two works, that the Para-Tone booklet's arrangement of material is so similar to the copyrightable arrangement found in plaintiff's work, including the juxtaposition and type of colors used, that Para-Tone must have used plaintiff's copyrighted book in the preparation of "Transparent Color Sheets" and the cross-reference sheet furnished in connection with it. Para-Tone's booklet therefore infringes upon plaintiff's copyright.

█ The record is equally clear that defendant, at the times when it distributed the Para-Tone leaflet and related materials to its customers, had access to or possession of plaintiff's copyrighted booklet. In fact defendant's sales manager, in his article entitled "New Developments in the Graphic Arts", published in the June 1968 edition of the magazine "Print", compared the two works. Defendant's conduct thereafter in distributing the infringing Para-Tone publication to its customers constituted an implementation of Para-Tone's unauthorized copying of plaintiff's work and was part and parcel of a selling or vending activity designed to use the infringing material for the purpose of permitting the sale and use of Para-Tone's system and materials. Since plaintiff's copyright gave it the exclusive right to "publish, copy and vend the copyrighted work", 17 U.S.C. § 1(a), it is entitled to injunctive relief against such unauthorized publication, copying or vending on the part of others. 17 U.S.C. § 101(a); see Platt & Munk, Inc. v. Republic Graphics, Inc., 315 F.2d 847 (2d Cir. 1963).

█ There is no merit to the various affirmative defenses asserted by the defendant. No valid support is offered for the contention that plaintiff's notice of copyright, which described its work as "Copyright 1963", was improper. The undisputed fact is that an earlier edition of the copyrighted work was registered by plaintiff's wholly-owned subsidiary, Pantone Press, Inc., in 1963 and that this edition was identical with the later edition registered by plaintiff in 1968, except for minor, immaterial differences. The notice fully conformed with Title 17 U.S.C. § 19 and Copyright Office Regulation 202.3(b) (3) thereunder.

█ Defendant's contention that plaintiff defrauded the Copyright Office by failing to mention, when it registered its work in 1968, "that material and substantial portions * * * had been previously published", apparently refers to plaintiff's mistaken reference in its 1968 application to the publication date as September 30, 1963 (instead of September 25, 1963) and that it was labelled "Pantone Matching System" with the added words (in smaller letters) "Printer's Edition". The defendant has filed affidavits, however, conceding that it has examined both works and finds them identical except for these differences, which are too immaterial and inconsequential to invalidate the registration certificate or render it fatally defective. Wrench v. Universal Pictures, 104 F. Supp. 374 (S.D.N.Y.1952); Nimmer on Copyright § 94, page 355 (1964 ed.). Likewise the fact that the copyright claimant was described in the September 1968 application as "Pantone Press, Inc. (also known as Pantone, Inc.)" constituted an innocent immaterial variance of no legal significance. Pantone Press, Inc. was in fact identical with the plaintiff. Such technical minutiae do not afford a basis for defeating an otherwise valid copyright. United States v. Backer, 134 F.2d 533 (2d Cir. 1943); Alart Associates, Inc. v. Aptaker, 279 F.Supp. 268, 270 (S.D.N.Y.1968).

█ Nor can the defendant escape responsibility on the ground that plaintiff executed a security assignment of the copyright to Dommerich. It is undisputed that the assignment was to effectuate a transfer of ownership to Dommerich only in event of default, which has not occurred, and that Dommerich consents to the plaintiff's enforcement of its

copyright in the plaintiff's work. Thus the plaintiff continues as the real party in interest and is entitled, as both the equitable owner and copyright proprietor, to maintain this suit for infringement. Manning v. Miller Music Corp., 174 F. Supp. 192 (S.D.N.Y.1959). The purpose of recordation of the assignment pursuant to Title 17, U.S.C. § 30 was to put subsequent purchasers or mortgagees on notice, New Fiction Pub. Co. v. Star, 220 F. 994 (S.D.N.Y.1915). It did not destroy plaintiff's status as "the copyright proprietor" entitled to sue for damages, 17 U.S.C. § 101(b), and its right as a "party aggrieved" to seek injunctive relief, 17 U.S.C. § 112.

■ Section 43(a) of the United States Trademark Act, 15 U.S.C. § 1125 (a), prohibits use of false designations or misrepresentations in connection with goods or services. Glenn v. Advertising Publications, Inc., 251 F.Supp 889, 902–03 (S.D.N.Y.1966). Whether one adopts a narrow interpretation of the statute (limiting it to the palming off of trademarked goods, Chamberlain v. Columbia Pictures Corp., 186 F.2d 923 (9th Cir. 1951)) or a broad view (that it prohibits *any* false representation in connection with goods or services, L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., 214 F.2d 649 (3d Cir. 1954)), defendant's distribution of the offending leaflet and cross-reference sheet entitled "Para Tone New Colors" violated § 43(a), since these materials would lead the ordinary observer to believe that the Para-Tone colors and color system are the same as plaintiff's Pantone colors and system, whereas as defendant concedes, the Para-Tone colors, while closely similar to plaintiff's and arranged in a manner that copied plaintiff's unique arrangement, do differ in shade, tint and quality from the Pantone colors represented to be the same. For instance, the cross-reference sheet "Para Tone New Colors" shows Para-Tone's "Yellow #101", whereas in fact the former has a greener tinge to it than the latter. Similar differences pervade the two color matching systems. However, an artist, designer, ink manufacturer or innocent purchaser of color sheets, could be misled by the defendant's works, including the cross-reference sheet, into the belief that the two color systems were substantially the same and that each of the cross-referenced colors was identical. This, of course, could cause serious and harmful consequences to plaintiff's business, as well as to members of the trade thus misled. The misrepresentation is used to advertise and sell an inferior and less expensive system, which has repeatedly been condemned as a violation of § 43(a). Crossbow, Inc., et al. v. Dan Dee Imports, Inc., 266 F.Supp. 335 (S.D.N.Y. 1967); Zandelin v. Maxwell Bentley Manufacturing Co., Inc., 197 F.Supp. 608 (S.D.N.Y.1961).

■ Thus the evidence reveals a reasonable probability that the plaintiff will prevail on the merits. Although proof of irreparable injury is not essential, Uneeda Doll Co. v. Goldfarb Novelty Co., 373 F.2d 851, 852 n. 1 (2d Cir. 1967); Rushton v. Vitale, 218 F.2d 434 (2d Cir. 1955); Joshua Meier Co. v. Albany Novelty Co., 236 F.2d 144 (2d Cir. 1956), the evidence supports such a finding and indicates that unless a preliminary injunction issues, the plaintiff as well as the public may suffer serious harm. The issuance of such relief, on the other hand, will not bar the defendant from advertising and selling its sensitized color sheets to artists and others. It merely enjoins the use of the infringing booklet and materials, or activities that would infringe the plaintiff's copyrighted work and mislead others into thinking that Para-Tone's system and colors are the same as those offered by the plaintiff.

The foregoing constitutes the Court's findings and conclusions as required by Rule 52(a), F.R.Civ.P.

The motion is granted on condition that plaintiff post a bond in the sum of $5,000. Rule 65(c), F.R.C.P.

Settle order in accordance with Rule 65(d), F.R.C.P.

# PARA TONE NEW COLORS

| | TINT | P.T. | P.M.S. |
|---|---|---|---|
| LEMON YELLOW | Tint 2 | 2503 | 101 |
| | Tint 1 | 2504 | 102 |
| | HUE | 2505 | Yellow |
| | Shade 1 | 2506 | 103 |
| | Shade 2 | 2507 | 104 |
| | Shade 3 | 2508 | 105 |
| CADMIUM YELLOW | Tint 2 | 2513 | 107 |
| | Tint 1 | 2514 | 108 |
| | HUE | 2515 | 109 |
| | Shade 1 | 2516 | 110 |
| | Shade 2 | 2517 | 111 |
| | Shade 3 | 2518 | 112 |
| BURNT ORANGE | Tint 2 | 2523 | 128 |
| | Tint 1 | 2524 | 129 |
| | HUE | 2525 | 130 |
| | Shade 1 | 2526 | 131 |
| | Shade 2 | 2527 | 132 |
| | Shade 3 | 2528 | 133 |
| ORANGE | Tint 2 | 2533 | 149 |
| | Tint 1 | 2534 | 150 |
| | HUE | 2535 | 151 |
| | Shade 1 | 2536 | 152 |
| | Shade 2 | 2537 | 153 |
| | Shade 3 | 2538 | 154 |
| VERMILLION | Tint 2 | 2543 | 177 |
| | Tint 1 | 2544 | 178 |
| | HUE | 2545 | WARM RED |
| | Shade 1 | 2546 | 186 |
| | Shade 2 | 2547 | 180 |
| | Shade 3 | 2548 | 181 |
| RUBINE RED | Tint 2 | 2553 | 218 |
| | Tint 1 | 2554 | 219 |
| | HUE | 2555 | RUBINE RED |
| | Shade 1 | 2556 | 220 |
| | Shade 2 | 2557 | 221 |
| | Shade 3 | 2558 | 222 |
| RHODAMINE RED | Tint 2 | 2563 | 231 |
| | Tint 1 | 2564 | 232 |
| | HUE | 2565 | RHODAMINE RED |
| | Shade 1 | 2566 | 233 |
| | Shade 2 | 2567 | 234 |
| | Shade 3 | 2568 | 235 |
| PURPLE | Tint 1 | 2573 | 251 |
| | Tint 2 | 2574 | 252 |
| | HUE | 2575 | PURPLE |
| | Shade 1 | 2576 | 253 |
| | Shade 2 | 2577 | 254 |
| | Shade 3 | 2576 | 255 |
| REFLEX BLUE | Tint 1 | 2583 | 278 |
| | Tint 2 | 2584 | 279 |
| | HUE | 2585 | Reflex Blue |
| | Shade 1 | 2586 | 280 |
| | Shade 2 | 2587 | 281 |
| | Shade 3 | 2588 | 282 |
| ULTRA BLUE | Tint 1 | 2593 | 298 |
| | Tint 2 | 2594 | 299 |
| | HUE | 2595 | 300 |
| | Shade 1 | 2596 | 301 |
| | Shade 2 | 2597 | 302 |
| | Shade 3 | 2598 | 303 |
| COBALT BLUE | Tint 2 | 2603 | 305 |
| | Tint 1 | 2604 | 306 |
| | HUE | 2605 | Process Blue |
| | Shade 1 | 2606 | 307 |
| | Shade 2 | 2607 | 308 |
| | Shade 3 | 2608 | 309 |
| THALO BLUE | Tint 2 | 2613 | 318 |
| | Tint 1 | 2614 | 319 |
| | HUE | 2615 | 320 |
| | Shade 1 | 2616 | 321 |
| | Shade 2 | 2617 | 322 |
| | Shade 3 | 2618 | 323 |

| | TINT | P.T. | P.M.S.* |
|---|---|---|---|
| THALO GREEN | Tint 2 | 2623 | 332 |
| | Tint 1 | 2624 | 333 |
| | HUE | 2625 | Green |
| | Shade 1 | 2626 | 334 |
| | Shade 2 | 2627 | 335 |
| | Shade 3 | 2628 | 336 |
| VIRIDIAN | Tint 2 | 2633 | 338 |
| | Tint 1 | 2634 | 339 |
| | HUE | 2635 | 340 |
| | Shade 1 | 2636 | 341 |
| | Shade 2 | 2637 | 342 |
| | Shade 3 | 2638 | 343 |
| PERMANENT GREEN | Tint 2 | 2643 | 352 |
| | Tint 1 | 2644 | 353 |
| | HUE | 2645 | 354 |
| | Shade 1 | 2646 | 355 |
| | Shade 2 | 2647 | 356 |
| | Shade 3 | 2648 | 357 |
| CHROME OXIDE GREEN | Tint 2 | 2653 | 366 |
| | Tint 1 | 2654 | 367 |
| | HUE | 2655 | 368 |
| | Shade 1 | 2656 | 369 |
| | Shade 2 | 2657 | 370 |
| | Shade 3 | 2658 | 371 |
| YELLOW GREEN | Tint 2 | 2663 | 373 |
| | Tint 1 | 2664 | 374 |
| | HUE | 2665 | 375 |
| | Shade 1 | 2666 | 376 |
| | Shade 2 | 2667 | 377 |
| | Shade 3 | 2668 | 378 |
| CHARTREUSE | Tint 2 | 2673 | 387 |
| | Tint 1 | 2674 | 388 |
| | HUE | 2675 | 389 |
| | Shade 1 | 2676 | 390 |
| | Shade 2 | 2677 | 391 |
| | Shade 3 | 2678 | 392 |
| RAW SIENNA | Tint 2 | 2683 | 474 |
| | Tint 1 | 2684 | 473 |
| | HUE | 2685 | 472 |
| | Shade 1 | 2686 | 471 |
| | Shade 2 | 2687 | 470 |
| | Shade 3 | 2688 | 469 |
| RAW UMBER | Tint 2 | 2693 | 481 |
| | Tint 1 | 2694 | 480 |
| | HUE | 2695 | 479 |
| | Shade 1 | 2696 | 478 |
| | Shade 2 | 2697 | 477 |
| | Shade 3 | 2698 | 476 |
| COOL GREY | #1 | 2701 | 427 |
| | #2 | 2702 | 428 |
| | #3 | 2703 | 429 |
| | #4 | 2704 | 430 |
| | #5 | 2705 | 431 |
| | #6 | 2706 | 432 |
| | #7 | 2707 | 433 |
| WARM GREY | #1 | 2711 | 406 |
| | #2 | 2712 | 407 |
| | #3 | 2713 | 408 |
| | #4 | 2714 | 409 |
| | #5 | 2715 | 410 |
| | #6 | 2716 | 411 |
| | #7 | 2717 | 412 |

BLACK #2720

WHITE #2721

GOLD #2722

SILVER 2723

* P.M.S. is a Trademark of Pantone Matching System